In re: Vicky Rodríguez-Torres
Debtor
_____

Vicky Rodríguez-Torres
Plaintiff

v.

Enid López-López
Guillermo Camba-Casas
Mariela Rexach-Rexach
Government Development Bank PR, et al.
Defendants

**09-10864-BKT7**
**Chapter 7**

**ADVERSARY PROCEEDING**
**10-00137-BKT**

**18 U.S.C. § 1030,**
**18 U.S.C. § 2510,**
**18 U.S.C. § 2701,**
**42 U.S.C. § 1983,**
**42 U.S.C. § 1985,**
**42 U.S.C. § 1988,**
**TORTS**

## OPPOSITION TO MOTION TO DISMISS

TO THE HONORABLE COURT:

Now comes Debtor and here Plaintiff Vicky Rodríguez-Torres, through the undersigned attorney, and states as follows:

## I. INTRODUCTION

**1.** The relevant time period for the present complaint starts as early as August 9th, 2008, or the full two full years set as the statute of limitations for the underlying *Computer Fraud and Abuse Act* (**CFAA**) cause of action, **18 U.S.C. § 1030**, and continues to the present date through the continued actionable acts and omissions engaged in by co-defendants.

**2.** This is an adversary proceeding arising under the Computer Fraud And Abuse Act (**CFAA**), and the Wiretap Act and Stored Communications Act of the Electronic Communications Privacy Act (**ECPA**). Out of the same acts

and omissions committed by co-defendants in violation of the provisions of CFAA and ECPA, also arise causes of action in Tort recognized by **Articles 1802** and **1803** of the **Puerto Rico Civil Code**, including, but not limited to, the following: negligence (duty of care, breach of that duty, causation and damages), negligence "*per se*", infliction of emotional distress, obstruction and interference with legal remedies, intentional Spoliation of Evidence as well as other related violations of Debtor's civil rights committed by defendants.

3. Debtor contends contend that co-defendants while exceeding their legitimate and business function authorization and access privileges: deleted, removed and destroyed information, documents and data contained on protected computers owned by GDB as a financial institution; and knowingly caused the transmission of a program, information, code or command to alter and tamper with the contents of the **Microsoft Exchange Server** environment deployed in support of GDB's business functions, including but not limited to: the underlying components of files, folders, mailboxes, databases, data stores, storage groups, information stores, transaction and journaling logs, back-up and restore components; and that as a result of such conduct, they intentionally caused Debtor to suffer loss and damages, in violation of the CFAA.

4. The claims, filed on behalf of Debtor, arise from the acts and omissions of defendants, when all throughout the time period starting on or around August, 2008, and uninterruptedly until the present day, they conspired to violate the CFAA, and committed the tort of spoliation of evidence, with the deliberate intent and actual effect of interfering with

Debtor's Civil Actions brought against Defendants in the United States District Court for Puerto Rico, case number 09-01151-JP, and case number 09-02199-FAB, a GDB internal administrative procedure, as well as the instant Bankruptcy case and its related adversary procedures. Debtor's injuries caused by co-defendants' behavior outlined above, also extend to interfere with other causes which to this date have accrued, but are yet to be filed by Debtor against GDB, for unlawful termination and separation pay. Defendants conduct was in abuse of their official governmental power, and in abuse of judicial process.

5. Unnamed co-defendants include employees, service providers, or agents of GDB, whose identities are unknown at this time, who during all times relevant to this complaint occupied in-house legal counsel and Information Technology positions and functions, all of whom were deliberately indifferent to Debtor's rights and caused the damages alleged, due to their acts and omissions, including but not limited to their failure to adequately supervise, evaluate, discipline, assign and monitor other GDB employees, contractors or agents directly involved in the unlawful conduct causing damages to Debtor.

6. Debtor contends that co-defendants had an agreement between themselves to intentionally and knowingly access GDB computers, exceed their authorization, and without any legitimate or valid GDB business reason or authorization, permanently delete all copies of all incriminating records, files and communications from said computers which could be discoverable and relevant to various judicial and administrative causes of action in which Debtor is their adversary, with the intend to

personally profit from said destruction, by subverting the judicial processes and interfering with Debtor's legitimate access to discoverable information, and consequently, her Constitutional right of access to the judicial system.

7. Co-defendants' actions deprived Debtor of her due process rights, obstructed justice, and was done under color of state law.

## II. <u>PARTIES</u>

8. Debtor is a former employee of creditor GDB.

9. Creditor and co-defendant GDB is a Puerto Rico governmental financial institution and public corporation created under **7 L.P.R.A. § 551**, et. seq.

10. Co-defendants Enid López-López (**López**), Guillermo Camba-Casas (**Camba**), are at all times relevant to this complaint employees of GDB.

11. Co-defendant Mariela Rexach-Rexach (**Rexach**) is at all times relevant to this complaint legal counsel representing co-defendants López, Camba, and GDB.

12. The aforementioned co-defendants directly caused the injuries to Debtor, and the violation of her civil rights, when they unlawfully and willfully lost, transferred, concealed, and destroyed evidence in possession and under the exclusive control of GDB, and which was essential to Debtor's ability to raise successful claims and defenses in the current and pending causes of action, as laid out above.

**13.** Rexach, as well as other Supervisory, unnamed, and yet unknown co-defendants also caused injury to Debtor by their actions and omissions in failing to prevent other co-defendants from engaging in unlawful and willful loss, transfer, concealment, and destruction of evidence.

## III. CASE 09-01151-JP

**14.** Debtor first became a GDB employee on or around September 3rd, 1996, and was a subordinate of co-defendant López from April 3rd, 2008, to December 15th, 2008. While under the supervision of López', on November 18th, 2008, Debtor filed a discrimination charge with the Equal Employment Opportunity (**EEOC**), and subsequently filed case 09-01151-JP on February 13th, 2009.

**15.** At issue, were Rodríguez' allegations that she had been routinely singled-out to be excluded from work-related activities, communications, and career development opportunities, all based on a discriminatory animus against her.

**16.** According to the above, prior to and during the progress of the case, López was Rodríguez' direct supervisor. Mariela Rexach-Rexach (Rexach) was counsel representing GDB all throughout the case. Guillermo Camba-Casas (Camba) was GDB's Human Resources Director and records custodian.

**17.** GDB's failure to disclose was promptly brought to the attention of the Court.

18. Concurrently within the discovery process, at a deposition taken on co-defendant López, the deponent admitted to routinely deleting communications from GDB's electronic messaging system. Debtor, in response, promptly brought to the attention of the District Court her concern over GDB's deliberate destruction of relevant electronic documents. Review of the District Court's denial of Rodríguez' request for an order of preservation and litigation hold is currently pending before the 1st Circuit Appellate Court in Case No. 10-1441.

19. GDB readily admitted that such evidence destruction practice was customary for them, as they – supposedly with their "$70,000,000.00-Plus" infrastructure - have to "*delete e-mail messages from her in-box in order to prevent it from becoming full.*", and cavalierly admitted that they had not retained any electronic versions of the deleted communications.

20. GDB boldly made the above assertion, when at the same time they were certifying to the District Court large disparities between the mailbox sizes under the custody of the different defendants, key-players, or persons of interest. For instance, GDB reported that co-defendant Marine Comas Torres had custody of a mailbox which extended to a size of 6,105.13 of *Megabytes*, or "*MB*", while co-defendant Enid López López had custody of a mailbox which meagerly extended to a size of 496.32 in the same unit of measure of "*MB*", or, scantily,

roughly 8% of the space made available to her aforementioned counterpart.

21. GDB never explained how one mailbox custodian, who so happens to be a trained lawyer – namely Enid López López - is so limited by the technological constraints of GDB's *"$70,000,000.00-Plus"* infrastructure, that she is constantly under the urge to continuously and unavoidably destroy electronic evidence which was relevant and directly at issue in an ongoing litigation, which she was professionally trained to identify. Neither did GDB attempt to offer an explanation as to why, at the same time, another mailbox custodian – namely Marine Comas Torres – under the same technological constraints, was able and afforded the luxury and comfort of disposing of over 1,200% the mailbox size space.

22. Tellingly, López was Debtor's supervisor at GDB, during the time Debtor has stated that she was subject to a unlawful discriminatory hostile environment; Debtor has stated that part of the discriminatory treatment exhibited against her was in the form of exclusion from work-assignment related communications and activities; López simultaneously praised Debtor's performance and competence, while at the same time requesting to her supervisors that Debtor be removed from under her supervision; the evidence López admitted to have destroyed was in relation to communications, meetings, and activities Debtor claimed she had been discriminatorily excluded from.

23. In case 09-01151-JP, therefore, there was more than some likelihood that potentially relevant evidence had and was being destroyed, as it

was unabashedly admitted and dismissed by GDB as their routinely daily practice. The destruction of potentially relevant evidence here at issue is also an uncontroverted fact, made part of the record in this case by GDB themselves.

24. Most damningly and incriminating to GDB is the obviously and egregiously bad faith through which the above instances of evidence destruction and spoliation where carried out: by co-defendant López, a trained lawyer who was co-defendant in case 09-01151-JP, who happened to be the direct supervisor of the employment discrimination plaintiff and here Debtor, who somehow was able to astonishingly overcome technological challenging circumstances to produce all exculpatory electronic communications, but who ultimately failed to produce any proverbial smoking-guns, even when the same should have been logically part of the sequence or communication threads of those exculpatory electronic communications which she was able to produce.

25. Concurrently with the above discovery process contentions, and before they had been ruled on by the District Court, GDB served on Debtor an administrative 'charge document', and summarily terminated her from employment.

26. Debtor contends that she was unlawfully denied discoverable and relevant evidence, from both GDB and other alternative sources and third parties. Debtor further contends on this point that, consequently, such denial prevented her from presenting sufficient competent, relevant and admissible evidence with which she would have been able to counter GDB's

motion for summary judgment in case 09-01151-JP, which eventually was granted against her.

## A. CHARACTER OF EVIDENCE DESTROYED

27. During the discovery process in case 09-01151-JP, Debtor took a deposition on López, in which she directly questioned the deponent in regards to career development related communications from which Debtor had been singled out to be excluded, for no apparent legitimate reason, while all other similarly situated individuals, however, were included in said communication. Most notably, during said questioning there were striking discrepancies between the amount of documents disclosed and produced by López, directly from GDB's official archives and files, and many of those which Debtor had been able to produce. Essentially, López' production had significant gaps of missing documents, which Debtor somehow was able to secure from alternative sources, such as her own personal files, or those of other colleagues.

28. During the examination, and as an explanation as to why she had failed to disclose or produce e-mail communications which she should have authored or received, López readily admitted to routinely deleting communications from GDB's electronic messaging system. López justification for such evidence destruction was that she had to do so in order to prevent her mailbox from becoming full. The deleted communication which came about during said questioning, was precisely one from

which Debtor was excluded, as opposed to all other similarly situated individuals.

29. Debtor promptly moved the Court to issue an order for preservation and litigation hold.

30. López further admitted that she had failed to retain any electronic copies of any e-mail that might have been related to the scheduling of the training sessions at issue, and which were material to Debtor's claims in the case.

31. López further made the disclaimer that she would be unable to produce any e-mail communications in native electronic format that had been issued as recently as April, 2008, although GDB had produced disclosures as old as May 10th, 1991 . Debtor indeed has been able to identify up to ninety-seven (97) documents produced by GDB with a creation date prior to or earlier than April, 2008.

32. In effect, when questioned as to why she had not retrieved a full set of documents from GDB's official records, and when she was asked to cure said production deficiencies, López asserted that any electronic documents that she had deleted, were effectively and permanently unrecoverable, and not even retrievable from GDB's back-up and archiving system.

33. López was unable to explain, however, how certain GDB employees were able to have mailbox configurations which extended to a size of 6,105.13 of Megabytes, or "MB", while

hers meagerly extended to a size of 496.32 in the same unit of measure.

34. López deliberately deleted and destroyed e-mail communications from the GDB message and collaboration system, such that they were rendered permanently unrecoverable through any of GDB's technical or administrative data-loss response systems or capabilities: the KPMG Business Continuity Plan, Evertec and IBM Tivoli or equivalent storage management software, Exchange native back-up and restore utilities, or Exchange monitoring and transaction logs.

35. López, as a business computer user with a financial, legal, and administrative background, and without any Information Technology expertise, function o responsibility, or authority to execute Administrator privileged, sensitive transactions or to define software configuration parameters, improperly gained access to GDB computers and software, whereby she effectively was able to perpetrate the evidence destruction, with the intended result that incriminating communications which were adverse to her interest in litigation, would be permanently lost.

36. López, after obtaining a limited level of initial access authority proper to her role as a business user, obtained access to highly protected information in the form of the forbidden virtual space of the Exchange configuration

parameters, that she was not entitled to access according to GDB policy.

37. Consequently, López intentionally and deliberately accessed a computer without authorization or in excess of authorization, through which she took specified forbidden actions, ranging from obtaining and changing software behavior and response, to damaging a protected computer or computer data in the records of a financial institution.

38. López could not have perpetrated all of the above destruction of evidence, without the direct involvement, assistance, and acquiescence of co-defendant Camba, as GDB's electronic records custodian.

39. Co-defendants Camba, Rexach, and other still unknown GDB Information Technology and In-house Counsel officials, facilitated López' actions, and further conspired with López to violate the CFAA.

## IV. <u>GDB INTERNAL ADMINISTRATIVE PROCEEDING</u>

40. GDB terminated Debtor's employment on November 10th, 2009, and Debtor sought to exhaust the administrative internal proceeding available within GDB.

41. Debtor promptly sought discovery of: (1) Security policies and access logs for all relevant Information Technology components; (2) Policies and Procedures in place for the use of hardware, software, and telecommunication components currently in place at GDB; (3) computer and equipment usage

"chargeback" or "cost accounting" records or procedures; (4) Business Continuity Plan; (5) Records Management Plan; (6) Communications certifying as to the initiation of a preservation plan or litigation hold.

42. Specifically, GDB objected to the request for the preservation plan and litigation hold communications as being privileged communications. GDB, however, did readily admit that the only responsive document to those effects was an e-mail communication sent by counsel and here co-defendant Rexach, on December 2nd, 2009.

43. Furthermore, co-defendant Camba, as designated records custodian for all of GDB, whether electronic or analog, under oath certified that GDB does not maintain any of the following: (1) Security policies and access logs for all relevant Information Technology components; (2) Policies and Procedures in place for the use of hardware, software, and telecommunication components currently in place at GDB; (3) computer and equipment usage "chargeback" or "cost accounting" records or procedures; (4) Business Continuity Plan; (5) Records Management Plan.

## V. CASE 09-02199-FAB

44. Debtor filed this retaliation cause of action against GDB on November 25th, 2009. Pending before the court are several instances of GDB's discovery behavior.

**45.** All discovery has been held in abeyance by the District Court, and consequently, any artifices through which GDB is able to destroy relevant evidence in this case, and render such evidence – as per their own admission – unrecoverable, continues to this day, and extends beyond the spoliation issue that was before the Court in case 09-01151-JP.

**46.** GDB's continued litigation behavior as it pertains to this case, which still has not concluded its discovery phase, is actionable separately under the CFAA.

## VI. GDB'S ELECTRONIC MESSAGING AND COLLABORATION ARCHITECTURE

**47.** In order to assess the extent to which all co-defendants are liable under the CFAA, it is necessary to examine the internal technological components of the messaging system from where Co-defendants permanently deleted, and continue to delete as a routine business practice, an further make unrecoverable, relevant electronic documents and communications.

**48.** GDB employs the Microsoft Exchange Server 2003 Enterprise Edition software (Exchange), spread out in approximately 40 Intel-based server computers.

**49.** Exchange has robust centralized control and data protection features that protect GDB from data loss which could inevitably carry serious regulatory and financial risks. Said control features are implemented through a ***distributed file directory-tree system***", regardless of the number of the computer servers hosting the application, which easily and

significantly not only prevent unauthorized and accidental distribution of data, but also its destruction. This arrangement, by its own design, inevitably makes it easier for GDB ant its counsel to ascertain the location and nature of the evidence that is located throughout GDB, and to organize the same in such an array, that discoverable and relevant data can be determined and pinpointed to accurately, in a rather expeditious fashion. See: *1 Jay E. Grenig and William C. Gleisner, III et al. (G&G), eDiscovery & Digital Evidence § 5:14 (October, 2010)*.

50. Exchange is also rich in "*Volume Shadow Copy*" functionality to restore deleted files, and easily preserve evidence, through users with the proper privileged or administrative permissions.

51. With this functionality, the possibility of not being able to recover deleted files has been eliminated almost to a certainty, by accessing the "*volume shadow*" to select an archived lost file for retrieval. The industry has incidentally embraced the functionality as a recognized method of preserving evidence when a potential producing party is on notice that litigation is likely to ensue. Incidentally, as early as 1999, this Circuit recognized the general availability of tools to recover deleted files. See: *U.S. v. Upham, 168 F.3d 532, 533 (1st Cir., 1999)*.

52. Exchange also has the "***Terminal Services***" capability of logging and monitoring the access to those files which have been designated as sensitive, to minimize substantially the possibility that data will migrate from a corporate environment to off-line, remote drives or home computers, without authorization.

53. The above wide range of information protection and control features are implemented by Exchange Software System Administrators (Administrators), who fine tune Exchange configurable-parameter policies, so that the right level of control is automatically applied to databases, file-systems, and individual messages, based on specific senders, recipients, content, and the organizational unit within which each GDB employee works. For the obvious internal control, segregation of duties, audit and regulatory mandated reasons, Administrators belong to an enterprise's Information Technology organization, removed from all the business and transaction originating organizations.

54. Exchange stores its information in five (5) "***Storage Groups***" per server. Each storage group can have as many as five (5) "***Databases***", and each database stores up to sixteen (16) terabytes. Each terabyte equals one-million megabytes, which is roughly equivalent to one-billion pages of information. In other words, stored strictly and exclusively only in Exchange,

GDB has the storage capacity of 3,520 billion pages worth of electronic documents.

55. Exchange databases storage structure keeps messages in a "*Single Instance*" architecture, whereby messages are not kept as discrete, duplicate items, repeated once for each targeted mailbox which happens to be the recipient of the given message. Instead, each "virtual message" is kept once, broken-down in its different informational objects in multiple transaction logs, and is assembled on-the-fly, when accessed or invoked by each "virtual recipient" or computer user.

56. Typically, financial institutions, such as GDB, segregate their sensitive information through the implementation of "*Chinese walls*" separating the data that each functional group needs to access to perform its business. Logging, monitoring, and surveillance of employee data access activity are logical controls that enable the locking up of sensitive information, as well as rendering confidential documents inaccessible. Instituting coding and creating security groups for computer access may also prove useful as physical barriers deterring misconduct while accessing the institution's computer system.

57. For instance, *The Sarbanes-Oxley Act of 2002*, the *Insider Trading and Securities Fraud Enforcement Act of 1988* ("ITSFEA"), *Rule 10b5-1*, *Rule 14e-3* and decisions by the SEC and the courts are just a few of the authorities which have effectively mandated the implementation of such compliance

policies and procedures. Exchange implements the above through the definition of "*Security and Distribution Groups*".

58. Exchange Administrators with special access to privileged command accounts, are the only individuals capable of defining "*Security and Distribution Groups*", each with its unique security identifier, based on the different functional groups, divisions, and departments of the enterprise organization. Groups are subsequently divided in "*Roles*", and "*Projects*", within the different groups, and this most basic level of organizational granularity is then assigned "*restrictions*", "*permissions*", and "*storage limits*".

59. Individual "*user accounts*", per employee, are then assigned to the different organizational units, and inherit the characteristics, controls, and limitations defined for that particular unit. The assignment of users to "*groups*", then results in a measure of consistency and efficient housekeeping, rather than creating such parameters for each user individually, with their own *ad-hoc* control parameters.

60. The "*Storage limits*" thus defined by the Administrators for each mailbox, include parameters to control "*Deleted Item Retention Time*". When an individual business-function user – who does not have Administrator-level privileged access to the most sensitive Exchange commands - deletes an e-mail, contact, event, or appointment information object, said object is not actually deleted from the Exchange Information Store, but

instead, hidden from the user and kept for the specified period of time configured by the above retention parameter.

61. Alternatively, Administrators can, in lieu of a retention time period, configure a parameter that retains deleted items indefinitely, until the mailbox store is successfully backed-up. In any event, the above retention parameters allow Administrators to quickly and easily salvage deleted items, without the necessity of a more cumbersome and time-consuming process of restoring the mailbox from back-up media storage. However, it must be noted that, increasingly throughout time, the practical limits of cost, time, and physical inconvenience of keeping this electronic information have been greatly surmounted, such that the electronic information is often retained not because it is expected to be used, but rather because the costs of storage are virtually nil, and thus there is no compelling reason to discard it. See: ***Rowe Entertainment, Inc. v. William Morris Agency, Inc., 205 F.R.D. 421, 429 (S.D. NEW YORK, 2002).***

62. Exchange back-up and recovery functionally protects its information against database corruption, hardware failure, accidental loss, and even deliberate destruction of e-mail messages. These utilities are defined and controlled by Administrators to run, once properly configured, automatically without human express intervention. As individual mailboxes are defined and assigned to each individual user, they

represent the smallest unit of recovery than can be processed by the back-up and recovery utilities.

63. "*Transactions*", on the other hand, control all changes that occur in a database. Exchange's failsafe functionality to ensure proper flow and recoverability of message data further includes the capability of maintaining activity, message, transactional, and monitoring logs. Through these logs, Exchange databases can be restored to reflect their state or snapshot at any given point or moment in time. Messages can be recovered by searching and retrieving from the logs based on individual message identification, by sender, by server hosting or processing the message, by recipient, by date, or virtually any search-string definable.

64. For co-defendant López, as a "Financial end-user" to have been able to permanently destroy the electronic documents at issue, to the point that they could not even be recovered within a limited and relatively recent time-frame, she necessarily would have had to access Administrator privileged and sensitive capabilities, where retention periods and transaction logs with which the missing documents could have been recovered were altered, and said documents irremediably lost.

65. In permanently deleting the records above, co-defendant López was assisted by co-defendant Camba, and coached by co-defendant Rexach.

**66.** In order to be able to assess the extent of the egregious behavior through which all co-defendants actively conspired to violate the CFAA, it is necessary to point out some of the policies which are widely recognized as industry best practices in the security and control of information technology resources. GDB's own assertions that they do not observe any of the following best practices, in and of itself, constitutes gross negligence, actionable by Debtor as the party who suffers prejudice on account of GDB's behavior.

**67.** The IT Governance Institute designed a set of principles that are contained in the publication ***Control Objectives of Information and Related Technologies*** (Available at: http://www.itgi.org), following the *International Organization for Standardization*, and the *International Electrotechnical Commission* standard for IT Service Management standards and best practices (***ISO/IEC 20000***). These principles provide a framework through which organizations can meet statutory and regulatory requirements set over the control of Information Technology, for instance, the segregation of duties prescribed by the Sarbanes-Oxley Act of 2002. See: **15 U.S.C. § 7211**.

**68.** Segregation of duties in this context, essentially, helps ensure that one individual cannot independently control all key aspects of computer operations within business departments, as well as system software controls that limit

and monitor access to sensitive programs and files. Together with service continuity controls, a proper segregation of duties ensures that critical operations continue during unexpected events.

69. *COBIT* process "**DS.5. Ensure Systems Security**", includes the establishment and maintenance of IT security roles and responsibilities, policies, standards, and procedures. It's most critical measurement used to gauge its success is the number of incidents in which segregation of duties are violated.

70. Objective "**DS.5.3. Identity Management**" ensures that users and their activities are uniquely identifiable; enables user identification via authentication mechanisms; and confirms that user access rights are in line with business needs. More importantly, it ensures that said user access rights are requested by user management, approved by system owners and implemented by the security-responsible personnel with IT technical competency.

71. Objective "**DS.5.4. User Account Management**" addresses the requesting, establishing, issuing, suspending, modifying and closing user accounts and related user privileges with a set of user account management procedures. It also includes an approval procedure outlining the data or system owner granting the access privileges. Such procedures apply for all users, including administrators (privileged users). Rights and

obligations relative to access to enterprise systems and information should be contractually arranged for all types of users.

72. GDB not only admits that relevant e-mail is continuously deleted as a routine business practice, it also admits that a deletion by a business end-user such as López can be done permanently. Co-defendant Camba admits that as records custodian for GDB he does not implement or have a records management program or a business continuity program.

73. In light of the security capabilities which are standard Exchange features, and the industry best practices laid out above, GDB's own admissions suggest a conspiracy by all co-defendants to violate the CFAA.

## VIII. GDB'S E-MAIL DELETION POLICY

74. At the outset, before boarding the elements of the causes of action here at issue, Debtor is bound to address GDB's continued audacity to try to make the tough sell of having the Court believe that there is nothing wrong with their *ad-hoc*, deliberate, and selective destruction of e-mail messages.

75. GDB incredulously and disingenuously argues: that GDB and its counsel acted diligently in responding to Debtor's discovery requests; that co-defendant López' deletion of relevant e-mail communications, which she herself asserts are not recoverable, does not amount to destruction of evidence; and that Debtor

has not been prejudiced in light of GDB's eventual production of manually self-selected and self-serving e-mails.

76. GDB then attempts to divert this Court's attention from the real issue at hand by explaining ad nauseam the lengths to which GDB purportedly went to comply with discovery obligations.

77. Each of GDB's arguments, however, are either irrelevant or blatantly contradicted by sworn testimony, and by the gratuitous statements by counsel through which GDB was effectively thrown under the proverbial bus.

78. GDB, however, asks this Court to disregard these compelling facts and, instead, accept GDB's assertion that no relevant e-mail correspondence was lost and that, therefore, Debtor has suffered no prejudice. GDB offers no proof other than a few self-serving statements by counsel, that directly contradict sworn deposition and interrogatory testimony of GDB employees, as well as counsel's own declarations.

79. GDB's attempt to now "change" their testimony further calls into question GDB's credibility and supports Debtor's assertion that GDB has not been forthright during the discovery process spanning all the cases covered by the relevant time period. GDB fails to address Debtor's pivotal argument that GDB destroyed electronic mail. At that point, GDB makes a feeble attempt to explain away its destruction of evidence through assumption and opinion. Specifically, GDB

states that there were no deleted e-mails relevant to the litigation here at issue, and that therefore, any destruction of e-mail was not prejudicial.

80. GDB's argument is fatally flawed for two reasons. First, GDB admits that it has never conducted an exhaustive search for relevant electronic mail, but that it has relied exclusively on employee self-serving self-selection. Accordingly, GDB cannot possibly assert to this Court that no "relevant e-mails" were destroyed. Second, GDB offers absolutely no support for its disingenuous argument that it does not have in place any programs through which its information is adequately identified, protected, and recoverable in case of inadvertent or accidental destruction.

81. Debtor correctly argues, and GDB fails to refute, that relevant internal e-mail continue to be deleted by GDB to this day, and that GDB is not taking any measures to rectify this impending risk. The point is, that GDB has no idea what electronic mail it has destroyed and it offers no assurance to this Court that additional relevant evidence was not permanently deleted. GDB has made absolutely no assurances that it has implemented a timely preservation effort.

82. GDB states matter-of-factly that it allows everyone to delete e-mails to keep their mailboxes from becoming full, yet it is unable to set forth a line of case law, or a single case, for that matter, or any authority, that excuses such destruction

of evidence. GDB admits that it destroys evidence under a "routine policy", where each employee can self-select what to destroy deliberately and selectively. This is neither "negligent" nor routine. It is bad faith. This is a blatant disregard for the Federal Rules of Civil Procedure, particularly regarding data preservation, and in this case, a conspiracy in violation of the CFAA.

83. There is, on the other hand, authority that ridicules assertions that employees in a functioning enterprise have to delete e-mails from their in-boxes to keep them from becoming full. <u>See</u>: ***Einstein v. 357 LLC, 2009 WL 4543044 (S. Ct. of New York, Commercial Division; November 12, 2009***).

84. Debtor has been severely prejudiced as a result and GDB's blatant and utter disregard for the Federal Rules of Civil Procedure and the CFAA, and this should not go unnoticed by this Court.

85. Similarly, GDB's rudimentary dissertation on the inner workings of its electronic mail system is irrelevant. GDB repeatedly attempts to use as an excuse practices which are overwhelmingly discredited, and shouldn't pass as reasonable in this case.

## IX. <u>LACK OF JURISDICTION RULE 12(b)(1)</u>

86. This Court has jurisdiction, and the instant claim is as much a core proceeding pursuant to **28 USC §§ 157**, as is the

Adversary Proceeding initiated by co-defendant GDB, 10-00139-BKT.

87. The acts which form the basis of this complaint are precisely the source of the defenses that Debtor can oppose to GDB in 10-00139-BKT, and consequently GDB will be a lacking an actionable claim in said case if any of Debtors contentions in the present claim were true.

88. The acts which form the basis of this complaint start as early as November, 2008, and continued until the present bankruptcy petition was filed in December, 2009, and therefore constitute part of the estate in bankruptcy. Disposition of the present claim, thus directly and materially affects the estate in bankruptcy.

89. Notwithstanding the above, the acts which form the basis of this complaint have continued passed the filing of this bankruptcy petition in December 2009, and continue to this day, and therefore, from that date on do not form part of the bankruptcy estate. Consequently, Debtor retains a pecuniary interest in the present litigation, and has standing as a party in interest to bring the present claim. See: *In re Sobiech*, 125 B.R. 110, 113 (Bankr. S.D. New York, 1991).

90. Many of the material facts which form the basis of this compliant did not come to Debtor's attention until on or around May, 2010, and consequently could not have been scheduled as part of the bankruptcy petition in December,

2009. Therefore, for any part of the present claim that does correspond to the estate in bankruptcy, the thermonuclear reaction of dismissal is not warranted, as such defect is easily cured by obtaining the trustee's ratification to proceed with the action, or obtaining the abandonment of the present claim. <u>See</u>: ***Dunmore v. U.S., 358 F.3d 1107, 1112 (9th Cir., 2004).***

## X. <u>COMPUTER FRAUD AND ABUSE ACT (CFAA)</u>

**91.** Co-defendant López, is a financial, functional business, end-user with authorization to enter business transactions into GDB computer systems. She does not have IT support, maintenance, or implementation duties in GDB, and accordingly is not assigned to a ***Security Group***, ***Role***, ***Project***, ***Permission***, within the IT organization in GDB. She does not have access to ***Privileged Transactions***, ***Administrator Accounts***, or ***Terminal Services***. Her roles and responsibilities in GDB do not include the necessity for her to define, change, delete, control, or access in any way the parameterization of ***Storage Groups***, ***Storage Limits***, ***Deleted Item Retention Time***, or ***Audit and Monitoring Logs***. López, in the ordinary course of GDB's business, does not need to access Exchange's database files directly for any purpose whatsoever, other than through the client-server, front-end Outlook application, as does any other functional business end-user in GDB.

92. López' own sworn testimony is to the effect that she deleted relevant e-mail communications which were addressed, or should have been addressed to Debtor, and other similarly situated individuals. López by herself, and through counsel and here co-defendant Rexach, both certified that any communications which were so improvidently deleted were in effect not recoverable, and had therefore been permanently lost.

93. Under Exchange's ***Single Instance Architecture***, e-mail communications do not reside, as it would appear to the naked-eye, physically in each end-user's Outlook mailbox. Such perception is only an illusion, as the computer internal "*bits and bytes*" composing each e-mail reside physically in a single ***.edb*** and ***.stm*** file, in deduplicated format, eliminating all but a single instance of recurring content.

94. Consequently, for López to be able to render the above deleted e-mails permanently lost, she had to necessarily and surreptitiously circumvent GDB's definition of internal controls, segregation of duties, application and access controls, and directly alter all the files and logs associated with the message. Furthermore, López surreptitiously gained access to System Console and Administration utilities not part of her security definitions, to alter the mailbox store limit set for deleted item retention time. López also surreptitiously gained access to any and all volume shadow copies, that Exchange had created of the deleted message.

95. The First cause of action of the Complaint alleges that López intentionally and without authorization accessed GDB's computer system and deleted business-related e-mail communications which she should have disclosed and produced during the discovery process of the three underlying cases. These actions constitute a violation of the Federal Computer Fraud and Abuse Act.

96. A violation occurs when an individual intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer. **18 U.S.C. § 1030(a)(2)(C)**. A qualifying protected computer is one which is exclusively for the use of a financial institution. **18 U.S.C. § 1030(e)(2)(A)**. The CFAA provides a private right of action against any person who: "*knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value . . .*". **18 U.S.C. § 1030(a)(4)**.

97. The term "damage" means any impairment to the integrity or availability of data, a program, a system, or information**, 18 U.S.C. § 1030(e)(8)**, and must cause a loss aggregating at least $5,000 in value, **18 U.S.C. § 1030(g)**, which is suffered by any victim, **18 U.S.C. § 1030(e)(11)**. This civil remedy extends to any person who suffers damage or loss by reason of the aforementioned violations. The word "any" has an expansive meaning, that is, one or some indiscriminately of whatever

kind, without requiring that the plaintiff have ownership or control of the affected computer. See: ***Theofel v. Farey-Jones, 359 F.3d 1066, 1078 (9th Cir., 2004)***.

98. Under the CFAA, an employee causes "damage" when she destroys company data. For example, the Seventh Circuit held a business was damaged because a former employee, rather than ordinarily deleting the files at issue from the employer's computer, he went at lengths to use a mechanism to permanently delete the files, in order to prevent their recovery. See: ***International Airport Centers LLC v. Citrin, 440 F.3d 418, 419 (7th Cir., 2006)***. The court further held that such permanent deletion met the "***damage***" requirement of **18 U.S.C. § 1030(e)(8)**, as it constituted the impairment to the integrity or availability of data, a program, a system, or information. ***Id.***. The court also found that an employee who permanently deletes files from his employer's computer is indeed meeting the "***exceeding authorized access***" access requirement, as such conduct would constitute accessing a computer with some level of authorization and, then abusing such access to obtain or alter information in the computer that the employee at issue is not entitled so to obtain or alter under **18 U.S.C. § 1030(e)(6).** ***Id., at *420.***

99. Similar reasoning was applied by a district court which found that a business was damaged because an employee deleted files from a computer, and installed software to destroy the files

such as to render them unrecoverable. <u>See</u>: ***Patrick Patterson Custom Homes, Inc., v. Bach,*** *586 F.Supp.2d 1026, 1030 (N.D.Ill., 2008)*. Also, for a case in which the employee deleted files residing in the corporate server, such as in the instant case, <u>See</u>: ***VI Chip Corp. vs. Lee, 438 F. Supp. 2d 1087, 1092 (N.D.Cal., 2006)***, where the court granted CFAA plaintiff summary judgment.

**100.** Co-defendant López exceeded her level of authorization (**18 U.S.C. § 1030(a)(2)(C),** in GDB's computers, or those of a financial institution which this statute intents to protect (**18 U.S.C. § 1030(e)(2)(A)**), and caused losses and damages to Debtor exceeding $5,000.00 in the form of impairment of a prior medical diagnosis, physical injury, medical and legal costs and expenses (**18 U.S.C. § 1030(e)(8)**).

**101.** In the instant case, the relevant allegations of the complaint contend that defendants "deleted, removed and destroyed information, documents and/or data contained on protected computers" and "knowingly caused the transmission of a program, information, code or command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer" in violation of the CFAA. This is sufficient for the court to conclude that Debtor has sufficiently pled a CFAA claim.

**102.** As to the conspiracy elements, the allegations above sufficiently plead that defendants had an agreement between

themselves to intentionally and knowingly access the respective GDB computers, without authorization, to delete all pertinent information to Debtor's claims from those computers.

103. The above is sufficient for this Court to find that Debtor has sufficiently pled a CFAA claim, and sufficiently pled an agreement between two or more persons to do an unlawful act that resulted in damages to Debtor. *Jackson v. Blue Dolphin Communications of North Carolina, L.L.C., 226 F.Supp.2d 785, 791 (W.D.N.C., 2002)*.

104. Debtor has also sufficiently pled a conspiracy claim. *MDM Group Associates, Inc. v. Emerald Isle Realty, Inc., 2008 WL 2641271, at *5-6 (E.D.N.C., 2008)*.

105. "Fraud" as used in the CFAA does not equate to common law fraud, but rather refers to the damage to property rights through dishonesty, schemes or other artifices. Debtor, consequently, has sufficiently pled the fraud requirement of the CFAA. See: *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121*.

## XI. ELECTRONIC COMMUNICATIONS PRIVACY ACT COMMUNICATION ACT

106. A violation under the Wiretap Act occurs when an individual intentionally intercepts an electronic communication through an electronic device, and intentionally uses said intercepted communication. **18 U.S.C. § 2510; 18 U.S.C. § 2511.**

107. The e-mail messages destroyed by co-defendant López as laid out in the CFAA cause of action above, were intercepted by her

while in flight in their corresponding journaling and transaction logs, before being delivered to their recipients.

108. Said messages were intercepted after they were sent and while they were in flight on GDB's servers, and in transit on their way to their ultimate destination, and before reaching their intended recipients.

109. Debtor's Tort civil cause of action arises when co-defendant López violated the statute and intercepted Debtor's own communications. **18 U.S.C. § 2511(2)(a)(ii)**.

110. Debtor alleges that the GDB Exchange Servers constitute a facility through which an electronic communication service is provided.

111. A violation under the Stored Communications Act occurred when co-defendant López intentionally exceeded her authorization to access a facility through which an electronic communication service is provided, namely the GDB Exchange Servers through which the CFAA violations were chronicled above. **18 U.S.C. § 2701**.

112. The unauthorized access to electronic communications at issue occurred while they were in electronic, temporary, intermediate storage incidental to their transmission, and while awaiting retrieval and download from their intended recipients.

113. Through the above unlawful access to said stored electronic communications, co-defendant López obtained, altered, and

prevented authorized access to the electronic communications, at the time during which they were stored in such system. **18 U.S.C. § 2701(a)(1).**

## XII. TORT OF SPOLIATION

**114.** More important than a stand-alone, separate cause of action in Tort, the subject of spoliation is discussed herewithin separately, because from the behavior that typically constitutes spoliation in ordinary litigation, in the instant case it constitutes the actual "loss" and "damages" that are intricate parts of the CFAA claim outlined above. Also, the elements of the behavior which are here contained, constitute the support for the causes of action recognized under **Articles 1802** and **1803** of the **Puerto Rico Civil Code.**

### A. DUTY OF COUNSEL REXACH

**115.** The duty of counsel and co-defendant Rexach to supervise GDB's tortuous behavior as laid out above is imposed right at the outset of the litigation. Through **Fed. R. Civ. P. 16** Rexach certified that all of GDB's representations were made to the best of her knowledge, information, and belief, formed after reasonable inquiry. **Fed. R. Civ. P. 26(g)** further imposed on her the duty to supervise all of GDB's discovery activities, including disclosures, answers to interrogatories and production of documents, and even extending to the efforts to preserve, retrieve, and retain ephemeral electronic data. This responsibility is only magnified in this age of

electronic discovery, where Rexach has the duty to ensure that she thoroughly understands GDB's IT infrastructure, an how it is maintained to identify, preserve, locate, retrieve, review, and produce responsive documents. See: *__Qualcomm Inc. v. Broadcom Corp.,__* *2008 WL 66932  at \*9 (S.D.Cal., 2008)*.

116. As in all three cases spanning the relevant time period of this complaint, where Rexach supervised GDB's withholding of tens of thousands of e-mails, and then parroted formulaic claims of burden and lack of reasonable access to the suppressed evidence, to aver that there were no other responsive documents, courts have found counsel to be remiss in meeting their supervisory obligations, to an extent that warrants a finding for counsel's  bad-faith. *Id.*, *at \*9*.

117. GDB's litigation misbehavior throughout all of the above causes action, and continuing uninterruptedly to this day has two prongs: GDB effectively withheld and withholds documents it should have disclosed, and GDB destroyed and continues to destroy documents through the cover-up effort laid out above in substantiating the CFAA claim. Courts have fashioned two well known explanations to determine the role played by counsel, and consequently their legal liability, under similar fact-patterns: (1) either the destruction or cover-up was done so effectively that counsel did not know or suspect that the suppressed documents once existed; (2) or counsel failed to discover the intentionally hidden documents or suspect their

existence due to their complete ineptitude and disorganization. ***Id.***, ***at \*12***..

118. Debtor's contention in this case is that neither one of the above two explanations is applicable to the instant case, but rather that: Rexach deliberately chose to buy GDB's self-serving statements, and relieved them of any further discovery obligations, and although she knew and suspected that there was additional evidence or information, chose to ignore the evidence and warning signs and accepted GDB's incredible assertions regarding the adequacy of their document search and production. Rexach had to know of the existence of the withheld documents, and worked with GDB to hide them. Rexach then made GDB's wild assertions her own, in hopes that, at worst, she would be perceived as only having chosen not to look in the correct locations for the correct documents. Such conduct is both unrealistic, and unacceptable. ***Id.***, ***at \*15***.

119. It is part of the record in the instant case, and that of the three cases where the complained about behavior originated, and has been readily admitted by counsel, that Rexach failed to advise GDB that a litigation hold had to be instituted by GDB in November, 2008, in order to preserve any potentially responsive and relevant evidence in the above litigation, and to recover any electronic evidence which could have been improvidently deleted. Rexach further failed to adequately supervise and monitor GDB's evidence collection,

recovery, preservation, retrieval, and production throughout all of the causes of action brought by Debtor.

120. Although Debtor potentially could have relief in the cases at issue through **Fed. R. Civ. P. 11**, **26**, and **37**, she also has relief through a Tort cause of action under Puerto Rico law, both as the underlying predicate acts which cause the damages and losses suffered under CFAA, and also as independent tort actions under theories of negligence, and negligence "per se".

121. At the outset of litigation involving computer-based discovery, attorneys on both sides have a heightened responsibility to inform their clients of the duty to preserve potentially relevant evidence, more so counsel who may be responding to computer-based discovery. Such responsibility includes taking reasonable steps to secure the integrity of that data, no matter how opaque. See: ***Procter & Gamble Co. v. Haugen, 179 F.R.D. 622 (D.Utah, 1998)***. Alleging the non-existence of formal *Records Management Programs*, or worst, of the existence of information in electronic format, can be devastately explosive for counsel. See: ***Linnen v AH Robins Co Inc., 1999 WL 462015, 10 Mass.L.Rptr. 189 (1999)***.

122. In any event, counsel's actions above were all in furtherance of GDB's stated CFAA fraud, and as such are attributable to GBD. See: ***Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962)***, finding client responsible for chosen counsel's conduct and litigation errors; ***Rouse v. Lee, 339***

*F.3d 238, 249 (4th Cir., 2003)*, finding client liable for acts of attorney under standard principles of agency; *Wachtel v. Health Net, Inc., 239 F.R.D. 81, 89, 91 (D.N.J., 2006)*, finding that counsel's misconduct exacerbates, not mitigates, client's discovery abuses.

123. GDB was aware of the actions of counsel and either participated in them as the source of the motivation or acquiesced in them. <u>See</u>: *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union, No. 00 Civ. 3613 (LAP), 2004 WL 1943099, at \*25 (S.D. NEW YORK, 2004)* : "*the individual defendants and their counsel may not engage in parallel know-nothing, do-nothing, head-in-the-sand behavior in an effort consciously to avoid knowledge of or responsibility for their discovery obligations and to obstruct plaintiff's wholly appropriate efforts to prepare its case.*".

**B. GDB'S OWN DISCOVERY DUTIES**

124. The obligation to preserve evidence arises when the party has notice that the evidence is relevant to potential litigation. <u>See</u>: *Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2nd Cir., 2001)*. The trigger date for the duty to preserve attach in a T.VII case such as this one, as a general rule, is the date when the EEOC charge was filed, or November 18th, 2008. <u>See</u>: *Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D. NEW YORK, 2003)*. On that date, counsel should have cautioned key-employees to retain all documents,

including e-mails and backup tapes, that could potentially be relevant to the litigation. *Id.*.

125. As to the scope of what should be preserved, with the geometric increase in storage capacity, coupled with the proportionate decrease in cost, the absolute bare minimum can be reasonably set at the disaster recovery backup tapes. More importantly, key-individuals who anticipate being a party or a witness to a lawsuit, must be extra cautious to increase the scope of their preservation, as they potentially have unique evidence, relevant to the case. *Id., at *217*.

126. More specifically, a party's preservation obligation includes suspending any routine document destruction policy, and activating a litigation hold program that encompasses all potentially relevant documents. *Id., at * 218*.

127. When evidence is destroyed in bad faith (i.e., intentionally or willfully), that fact alone is sufficient to demonstrate relevance. Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent. *Id., at *220*. Now, depending on the remedy sought by the party aggrieved by this spoliation, it will have to determine the degree with which the spoliator had a culpable state of mind, and the degree to which the missing evidence is relevant. See: ***Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 107 (2nd Cir., 2002)***.

128. The relevance requirement, however, is met by merely adducing sufficient evidence from which a reasonable trier of fact could infer that the destroyed evidence would have been of the nature alleged by the affected party. The prejudiced party, then, should not be held to too strict a standard of proof regarding the likely contents of the destroyed evidence, because doing so would allow the spoliating party to profit from that destruction. *Id., at *109*.

129. *Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp., 220 F.R.D. 429, 433-434 (2004)* sets forth the benchmark to determine the appropriateness of preservation order depends on court's (**1**)level of concern for the continuing existence of the evidence at issue;(**2**) any likely irreparable harm to be suffered by the moving party, if the order does not issue; and (**3**) the producing party's capability to maintain the evidence sought to be preserved.

130. Parties are always under a duty to preserve evidence – in whatever format it happens to be, electronic or analog – that might have any potential to be relevant, or can reasonably lead to the discovery of admissible evidence. *Leon v. IDX Sys. Corp., 464 F.3d 951, 959 (9th Cir., 2006)*; *Nat'l Assoc. of Radiation Survivors v. Turnage, 115 F.R.D. 543 (1987)*.

131. Duty to preserve evidence attaches at the time of inception of a case. *Zubulake v. UBS Warburg, 220 F.R.D. 212, 218 (S.D. NEW YORK 2003)*; *Silvestri v. General Motors Corp., 271 F.3d 583, 590 (2001)*; *Velez v. Marriott PR Management, Inc., 590 F.Supp.2d 235, 258 (D.Puerto Rico,*

*2008)*. What type of evidence needs to be preserved, will depend largely on the context of the underlying cause of action. In an employment discrimination case, such as the instant case, communications and calendar appointments between Rodríguez' supervisor and others at GDB, concerning Rodríguez' work assignments. ***Zubulake v. UBS Warburg, 220 F.R.D. 212, 216 (S.D. NEW YORK, 2003)***.

132. *'The duty to preserve relevant evidence is fundamental to federal litigation'*. ***Innis Arden v. Pitney Bowes, Inc., 257 F.R.D. 334, 339 (2009)***. **Fed. R. Civ. P. 26(f)** establishes the duty to discuss and provide for adequate preservation of ESI. **Fed. R. Civ. P. 26(g)** further imposes on counsel the duty to supervise GDB's discovery efforts and compliance, including those of preservation of ESI.

133. GDB's ensuing failure to meet its discovery obligations, because the evidence that it ostensibly would produce is continuously being destroyed, cannot be reasonably considered not harmless and inconsequential. Contrarily, courts have found it to constitute sufficient prejudice. ***In re Seroquel Products Liability Litig., 244 F.R.D. 650, 665 (2007)***; ***Paramount Pictures Corp. v. Davis, 234 F.R.D. 102, 112 (2005)***.

134. Furthermore, as large, technologically sophisticated institutions, such as GDB, increasingly move from paper based communications and archiving of documents, to entirely computer based, electronic messaging and transactional environments, an unchecked practice of destroying and failing to preserve evidence, would have the effect of crippling discovery in discrimination and retaliation cases, such as the present

one. This undermines the strong public policy in resolving disputes on their merits. ***Zubulake v. UBS Warburg, 217 F.R.D. 309, 317 (S.D. New York, 2003)***.

135. GDB's obligation to preserve the evidence at issue arose when they reasonably believed it to be relevant to this litigation. Once the obligation attached, and the evidence was known to have been destroyed on or around August, 2009, it was incumbent on the District Court to consider whether such destruction was intentional, the likely contents of that evidence, and the remedies available to Rodríguez for redress. Nevertheless, what Debtor brought before the District Court on August, 2009, and which is now pending review by the Circuit Court, was a request for a finding of spoliation at that time, and a preservation order to continue such destruction. The cause of action brought here is for a separate actual tort, which is being committed by GDB, and has been committed by GDB ever since August, 2009, and through which GDB continues to this day to destroy relevant evidence Debtor will eventually need in all of her pending cases in the District and Circuit Courts.

136. What GDB dismisses as not only an ordinary, routine - and even worst - day-to-day necessary business process, namely the deliberate and intentional constant deletion of electronic communications and calendar events relevant to a case that is in litigation, has been consistently discredited and rejected by District Courts. Absolutely nobody who is part of a formal organization in the year 2010, seriously believes that

it is appropriate for anyone to randomly destroy in an ad-hoc fashion, the communications which form part of the organization's formal records.

137. *Connor v. Sun Trust Bank, 546 F. Supp. 2d 1360, 1366-1367 (N.D.Cal., 2008)*, is such case, which coincidentally exhibits a fact pattern similar to the present case: An employment related federal cause of action, where the plaintiff had been terminated from her job, and where during discovery it was revealed that an e-mail authored by plaintiff's supervisor, and regarding plaintiff's work assignments, had been deleted, and where the employer was moving for summary judgment. The court ruled that employer's actions constituted culpable spoliation, and denied employers motion for summary judgment. *Connor*, however, is materially distinguishable from the instant case regarding the egregiousness and level of culpability of the defendant employer.

138. In *Connor* the employer did in fact take affirmative and demonstrable steps to: identify and preserve all relevant documents relating to the plaintiff's termination; initiate an internal investigation; identify employees likely to possess relevant information; issue preservation instructions, which included express guidance to identify and preserve all documents in their possession, including email communications, that related to plaintiff's termination. *Id.*. Another important distinction between *Connor* and the instant case is that the e-mail at issue was not deliberately deleted by plaintiff's supervisor, but rather automatically purged from the messaging system as part of the normal, routine, maintenance and archiving functions of the software. Further, the

automatic purging took place during the time lag between the e-mail being broadcast, and issuance of the preservation order. *Id. at *1367*.

139. Notwithstanding all the affirmative effort put forth by the *Connor* employer to preserve evidence, the court still: found that plaintiff had suffered prejudice; established a presumption that other relevant communications had been destroyed; and concluded that the employer had acted in bad faith, and denied summary judgment. *Id. at *1376*.

140. In the instant case, the destruction of the evidence was made deliberately, not inadvertently. Nothing in the record of the instant comes close to even suggesting that GDB even gave some cursory thought to preservation, or even recovery, of electronic evidence it knew for a fact was relevant and had been destroyed by someone in clear conflict of interests with the full disclosure of said evidence. GDB, in its persistent callous disregard for Debtor's discovery rights, even refrained from offering the District Court, or Debtor, any assurances that GDB's indiscriminate destruction of evidence would cease, or that GDB would take affirmative steps to recover the evidence that might have been lost, as courts have requested in the past. *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,* 2004 WL 305601 at *1 (S.D. New York, 2004).*

141. Intentional destruction of evidence is sufficient to raise an adverse inference, even absent a showing of bad faith, where the preservation of such records is dictated by the law or laws designed to protect the adversely affected party. As in the instant Title VII case, where EEOC regulations require GDB to keep Rodríguez' employment records, which

include e-mail communications, for one year after her termination, and where those records and those of other employees are relevant to the question of whether the GDB's reason for terminating Rodríguez was pretext. ***Zimmermann v. Associates First Capital Corp., 251 F.3d 376 (2nd Cir., 2001).***

142. ***Pension Committee Of The University Of Montreal v. Banc of America, 685 F.Supp.2d 456 (S.D. New York, 2010)*** also focused on when negligent failures to preserve, collect, and produce documents-including electronically stored information-in discovery may justify the severe sanction of a form of adverse inference instruction. To that end, it ruled that a failure to preserve relevant evidence is undoubtedly negligent or even grossly negligent or willful, depending on the extent of the failure to collect evidence, or the sloppiness of the review. ***Pension Committee***, *685 F.Supp.2d 456 at *465.*

143. More importantly, ***Pension Committee*** went on to establish that, as in the instant case, the volume of missing emails and documents can never be learned, nor can their substance be known, precisely because it was the producing party's misconduct that destroyed the evidence. But, knowing that the missing documents were created at times relevant to the case, and that the documents involve correspondence between key-players regarding conduct at issue, can only lead to the conclusion that there can be no serious question that the missing material would have been relevant. ***Pension Committee***, *685 F.Supp.2d 456 at *479.*

144. ***Rimkus Consulting Group, Inc. v. Cammarata, 688 F.Supp.2d 598 (S.D.Tex., 2010)*** is another authority which presents a fact pattern much

like the instant case: the record included evidence that the defendants intentionally deleted emails, and took other steps in order to conceal evidence. The court found that this behavior was sufficient evidence from which a reasonable jury could find that relevant e-mails and attachments were intentionally deleted to prevent their use in pending litigation. Based on that alone, spoliation and withholding of evidence relevant to the case, the court denied summary judgment in favor of the producing party.

**145.** A District Court may sanction a party for spoliation of evidence in several ways, including issuing jury instructions that raise a presumption against the spoliator. ***Flury v. Daimler Chrysler Corp., 427 F.3d 939, 945 (11th Cir., 2005)***. This Circuit Court has done so, holding that bad faith is not essential to imposing severe sanctions if there is severe prejudice, such as the prejudice Debtor has suffered as detailed above.

**146.** ***Sacramona v. Bridgestone/Firestone, Inc., 106 F.3d 444, 447 (1st Cir., 1997)*** found that although bad faith is not essential, if the evidence at issue was mishandled through carelessness, and the other side is prejudiced, sanctions, including in the form of exclusion evidence, is proper.

**C. TORT ACTIONS UNDER ARTICLES 1802 AND 1803 OF THE PUERTO RICO CIVIL CODE**

**147.** GDB's legal research was unable to find any jurisdictions which considered spoliation an actionable tort. Debtor contends that this failure is not just an "oversight", but in reality a deliberate attempt to mislead the Court, and submits

the following authorities in opposition: ***Foster v. Lawrence Mem'l Hosp., 809 F.Supp. 831, 836 (D.Kan., 1992)***, which states that Kansas recognizes torts of negligent and intentional spoliation; ***Hazen v. Municipality of Anchorage, 718 P.2d 456, 463 (Alaska 1986)***, which states that in Alaska, there exists a common-law cause of action in tort for intentional interference with prospective civil action by spoliation of evidence; ***Rodgers v. St. Mary's Hosp. of Decatur, 597 N.E.2d 616, 620 (Ill .1992)***, concluding that private cause of action existed in Illinois for spoliation under statute requiring preservation of x-rays when hospital was notified of relevant pending litigation; ***Thompson ex rel. Thompson v. Owensby, 704 N.E.2d 134, 139 (Ind.Ct.App.1998)***, stating that a cause of action existed in Indiana for negligent failure to maintain evidence; ***Hirsch v. Gen. Motors Corp., 628 A.2d 1108, 1115 (N.J. Law Div. 1993)***, stating that New Jersey recognizes a tort analogous to intentional spoliation of evidence called fraudulent concealment of evidence; ***Henry v. Deen, 310 S.E.2d 326, 334-35 (N.C.1984)***, stating that there is a cause of action for spoliation of evidence in North Carolina; ***Smith v. Howard Johnson Co., Inc., 615 N.E.2d 1037, 1038 (Ohio 1993)***, stating that in Ohio a cause of action exists in tort for interference with or destruction of evidence.

148. Co-defendants GDB, López, and Rexach have gone through extraordinary lengths to try to portray their deliberate

spoliation and failure to preserve evidence from November, 2008 to the present date, merely as innocent acts resulting from a "*pure heart and an empty head*", while this stance has been repeatedly discredited and ruled by courts as constituting gross negligence. **_Pension Committee_**, *685 F.Supp.2d 456 at \*464*; **_Rimkus Consulting_**, *688 F.Supp.2d 598 at \*607*.

149. Puerto Rico, likewise, has found that when counsel "**_ignored_**", "**_slanted_**", or "**_concealed_**" evidence, such acts and omissions constitute "**_gross negligence_**". Further, as is already apparent from GDB's own admissions and statements by counsel, when counsel perpetrates those acts in premature and preconceived idea of aiding and supporting their client's theory, they commit a "**_serious ethical and professional misjudgment_**". See: **_In re Colton Fontan, 128 D.P.R. 1, 93-94 (1991)_**. Acts of gross negligence have also been found to be actionable torts in Puerto Rico in: **_Morales Torres v. J.R.T., 119 D.P.R. 286, 293 (1987)_**; **_Rivera v. E.L.A., 121 D.P.R. 582, 595 (1988)_**.

150. Debtor also has relief through a Tort cause of action for the above acts of spoliation as committed by all co-defendants under Puerto Rico law, both as the underlying predicate acts which cause the damages and losses suffered under CFAA, and also as independent tort actions under theories of negligence, and negligence "per se". See: **_Restatement of Torts, 3rd, § 14. Statutory Violations As Negligence Per Se_**: *An actor is*

*negligent if, without excuse, the actor violates a statute that is designed to protect against the type of accident the actor's conduct causes, and if the accident victim is within the class of persons the statute is designed to protect.*

151. Lastly, where there is prior employee – employer relationship, such as between Debtor and GDB, **Article 1802** of the **Puerto Rico Civil Code** recognizes tort liability arising from the employer's "***ex delicto***" acts when it has breached its obligations and duties imposed by law that are necessary for social coexistence. <u>See</u>: ***<u>El Municipio de Cayey v. Soto Santiago</u>, 131 D.P.R. 304, 329 (1992).***

### XIII. <u>COLLATERAL ESTOPPEL</u>

152. This principle does not apply to the instant CFAA claim.

153. The issue of spoliation before the Court in case 09-01151-JP was related only to acts known to Debtor on August 26th, 2009. The instant claim, although it overlaps with some events under consideration of the Court in said case, extends to behavior by all co-defendants subsequent to August 26th, 2009, and extending case 09-02199-FAB, and GDB's internal administrative procedure, and also extends to acts and omissions which are still occurring to this day.

154. Further, relevant facts such as GDB's claim that it does not maintain a system of records management or a business continuity plan, are material to the CFAA claim, and did not come to Debtor's attention until around May, 2010.

**155.** Consequently, principles of collateral estoppel do not apply to the instant CFAA claim.

## XIV. <u>REQUEST FOR SANCTIONS</u>

**156.** Notwithstanding multiple defects in this request, and counsel's failure to perform a diligent and adequate inquiry into the law and facts purportedly supporting such a claim, only after allowing the parties to conduct the discovery process in the present case, will this Court be in a position to assess if Debtor and her counsel are in any way purposefully misleading it.

## XV. <u>CONCLUSION AND PRAYER FOR RELIEF</u>

For all of the above, Debtor prays that this Honorable Court:

Take notice of all of the above;

**DENY** co-defendants motion to dismiss, **ECF No. 11**;

**ORDER** Chapter 7 Trustee to appear as real party in interest for the part of the claim which forms part of the bankruptcy estate, or alternatively, that the present claim be abandoned for Debtor to pursue on her own.

**Submitted in New York, New York, this 1st day of November, 2010.**

**S/William E. Meléndez Menéndez**
**William E. Meléndez Menéndez**
USDC PR No. 226902

Attorney for Debtor
410 Park Avenue 15th Floor, Suite # 1223
New York, New York 10022
Tel. (718) 725-7387
We.Melendez@e-Lex.us

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties in interest.

In New York, New York, this 1st day of November, 2010.

**S/William E. Meléndez Menéndez**
**William E. Meléndez Menéndez**
USDC PR No. 226902